## MORAGNEL v. MOORE–McCORMACK LINES, Inc.

### No. 2916.

District Court, D. Maryland.

Feb. 11, 1948.

Paul Berman and Sigmund Levin, both of Baltimore, Md., for libellant.

Francis E. Pegram Jr., of Baltimore, Md., for respondent.

COLEMAN, District Judge.

This is a libel in personam, brought originally under the Suits in Admiralty Act, 46 U.S.C.A. §§ 741–752, against the United States and the Moore-McCormack

Lines, Incorporated, owners of the Steamship Joseph M. Medill, on which libellant claims to have been injured on December 30, 1946, while employed as a stevedore in unloading iron ore from one of the holds of that vessel while lying at Pier 3, Canton, Baltimore Harbor.

By agreement of the parties, the United States was dismissed as a party respondent, because the vessel was under a bare-boat charter from the Government to the other respondent.

· Summarized, the evidence bearing upon the injury to libellant is as follows: On the afternoon of December 30, 1946, libellant was one of a gang of Negro stevedores employed by The Cottman Company, an independent stevedoring contractor, to remove the iron ore that remained in No. 4 hold of the Steamship Joseph M. Medill, after the major portion of the ore in that hold had been removed by traveling cranes on the pier. The method employed for removing the balance of the ore was by tubbing, that is to say, by hand shovelling of the ore into steel tubs which were then hoisted from the hold by the vessel's own booms and winches.

Libellant testified that, although he did not know the name of the vessel on which he was working, as he started down into No. 4 hold for the first time (he having earlier in the day been working in No. 5 hold of the same vessel), the first rung of the steel ladder, which he grasped in beginning the descent, pulled out of place, causing him to fall backwards down into the hold some eight or ten feet, landing on his back on some of the ore. Libellant claims that the rung of the ladder remained in his hand as he fell, that he got up with his back hurting him, came out of the hold, and reported his injury to his gang foreman, to whom he also gave the rung of the ladder.

Two other colored stevedores testified that while they also did not recall the name of the vessel, they knew libellant and were working with him in No. 4 hold on the afternoon of December 30, 1946; that they had immediately preceded libellant down the same ladder which showed no defect, but that a few seconds later they saw him fall, saw the broken rung in his hand, and also the place on the ladder from which the rung had come.

The timekeeper for libellant's employer, The Cottman Company, testified positively that he saw libellant working on this particular ship on the day in question. He produced a time sheet of libellant's work, showing that he had been in hold No. 4, and that he was checked out around the time when he claims to have been injured. This timekeeper also testified that while he did not see libellant fall, he had been told by libellant when he came out of No. 4 hold that he had fallen and hurt his back, and that he, the timekeeper, then accompanied libellant to No. 4 hatch and there saw the ladder with the missing top rung. This witness further testified, however, that he made no report of what libellant told him, or of what he had seen, to any of his superiors or to any officer of the vessel. The reason he gave for not making such a report was that at the time there was no officer of the vessel on board.

Libellant's gang foreman was not produced because, as asserted by libellant's counsel, he was at sea and unavailable.

As opposed to the foregoing testimony produced on behalf of libellant, respondent produced testimony of the person who became master of the Joseph M. Medill about a month following the accident. There was no testimony by the person in command of the vessel at the time of the accident, because he was alleged to be insane and confined in a mental institution abroad.

The master who subsequently assumed command testified that he knew of no defect of the ladder in No. 4 hold or of any ladder in any other hold on the vessel, and that the list of repairs made on the vessel, prior to his assuming command, disclosed no repairs of this nature. These repair lists were introduced in evidence and confirmed this witness' testimony. To the same effect was the smooth log of the vessel, although the rough log, which was also introduced in evidence, shows that repairs to some ladders, not specifically named, had been ordered some weeks before the accident while the vessel was in Rio de Janeiro, but no requisitions or vouchers covering

any such repairs were produced because said to be unavailable, and there was nothing to identify any ladder, to which any repairs may have been made, with the ladder in No. 4 hold.

The testimony of this later master of the vessel was confirmed by testimony of the vessel's second mate but he, likewise, had not become attached to the vessel until after the injury to libellant, and his inspection was not made until several months thereafter.

While libellant and the two other stevedores appeared to have very limited education, nevertheless, they, as well as all of the other witnesses whose testimony we have just summarized, gave the impression of being honest and of trying to tell the truth to the best of their recollection. The fact that the vessel left Baltimore a few days after the accident and thereafter engaged in distant voyages, with changed personnel, may account for lack of records identifying just what repairs had been made on the vessel prior to the accident.

At the time of libellant's injury, it is uncontradicted that another vessel, of Russian registry, was lying near the Joseph M. Medill, and respondent's counsel contends that since libellant and his fellow stevedores could not give the name of the vessel on which he was injured, it is reasonable to infer that he might well have been working and been injured on this other vessel from which his employer, The Cottman Company, was engaged in unloading iron ore at the same time, but by means of traveling cranes. However, we cannot attach much importance to this contention. It is directly contrary to the testimony of Cottman's timekeeper, who was most definite in his statements to the effect that he had personally seen libellant on the Joseph M. Medill, had interviewed him shortly after the time he alleged he was injured, and that the work records which he, the timekeeper, kept showed that libellant had not been working on that day on any other vessel. While naturally anxious to shift responsibility, if any, for libellant's injury from his own company to the respondent, if legally possible, there is absolutely no other basis indicated in derogation of his statements or the records that he introduced. Furthermore, there is no necessity for a stevedore to know the name of any vessel on which he works. He is shifted from one to another. He is not attached to a vessel. All vessels probably seem about the same to him, i. e., merely places where he is assigned to work.

■ On this state of the testimony, we are satisfied that the weight of it clearly indicates that libellant was injured as he claims. Admittedly, it is somewhat unusual that neither his employer, The Cottman Company, nor respondent has any record that the ladder which libellant claims gave way, had ever been repaired or was in need of repairs. However, The Cottman Company's report of the accident to the United States Employees' Compensation Commission states that libellant was injured at the time and place and in the manner which libellant and his two fellow stevedores testified to. Respondent has had full opportunity to try to disprove the truth of this report, if false. We thus conclude that there is neither conflict or ambiguity in the testimony sufficient to create any real doubt as to the truth of what libellant and supporting witnesses have said.

■ Being thus satisfied that libellant has proved that he was injured on the Joseph M. Medill because of a defective ladder which he was required to use in the course of his employment as a stevedore in unloading that vessel, we turn to a consideration of whether he may recover from the respondent for such injury, and for the purposes of this case, the respondent is to be treated, because of its bare-boat charter of the vessel, as having the same status as that of the vessel's owner.

The right to recover in the present case finds direct support in Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L. Ed. 1099, rehearing denied 328 U.S. 878, 66 S.Ct. 1116, 90 L.Ed. 1646, decided less than two years ago, that is, in April, 1946. To be sure, the result of that decision has been, in effect, to give a new right to maritime workers not members of a crew of a vessel, which prior to that decision was not recognized by the maritime law or by any statute.

In that case the respondent, an employee of a stevedoring company which had contracted with petitioner to load its vessel in navigable waters, was injured while so employed, due to hidden defects in a part of the ship's tackle. Both the trial court and the Circuit Court of Appeals found two other defendants who had built and equipped the vessel, liable for negligence in furnishing the defective tackle. However, both of these courts held that respondent's injury was not attributable to any negligent act or omission on the part of the vessel owner. Nevertheless, the Court of Appeals allowed, and the Supreme Court affirmed, a recovery by the respondent against petitioner, the vessel owner, on the ground that the latter is liable for any injury, caused by the unseaworthiness of his vessel or its appliances, to a maritime worker on board, even though not a member of the crew or the ship's company and not employed by the vessel, such liability arising as an incident, not merely to the seaman's contract, but of performing the ship's service with the owner's consent.

The result of this decision is that although Congress, by the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C.A. §§ 901–950, cut off from longshoremen and harbor workers the right extended to them by judicial construction of the Jones Act, 46 U.S.C.A. § 688, to enjoy the same right of recovery from the vessel owner as was enjoyed by seamen, for negligent injury sustained while working on navigable waters, International Stevedoring Co. v. Haverty, 272 U.S. 50, 47 S.Ct. 19, 71 L.Ed. 157; Uravic v. F. Jarka Co., 282 U.S. 234, 51 S.Ct. 111, 75 L.Ed. 312; Swanson v. Marra Bros., 328 U.S. 1, 66 S.Ct. 869, 90 L.Ed. 1045, they have not been deprived of the protection given them with relation to personal injury by general or statutory maritime law.

The Court's opinion, rendered by Mr. Justice Rutledge, contains a detailed analysis of the Court's long line of prior decisions giving the historical basis for the doctrine of absolute duty on the part of the shipowner to supply a seaworthy vessel and equipment, and establishing the principle that this obligation is essentially a species of liability without fault, and is neither limited by conceptions of negligence nor contractual in character, nor confined to those who perform the ship's service under immediate hire of the owner, but extends to those who render such service with the owner's consent or arrangement. The Court then said—and we quote at considerable length because, as above stated, the Supreme Court had not heretofore extended to stevedores the doctrine upon which the present libellant relies, 328 U.S. 85 at pages 99–102, 66 S.Ct. 872 at pages 879–881:

"Running through all of these cases, therefore, to sustain the stevedore's recovery is a common core of policy which has been controlling, although the specific issue has varied from a question of admiralty jurisdiction to one of coverage under statutory liability within the admiralty field. It is that for injuries incurred while working on board the ship in navigable waters the stevedore is entitled to the seamen's traditional and statutory protections, regardless of the fact that he is employed immediately by another than the owner. For these purposes he is, in short, a seaman because he is doing a seaman's work and incurring a seaman's hazards. Moreover, to make the policy effective, his employer is brought within the liability which is peculiar to the employment relation to the extent that and because he also undertakes the service of the ship.

"It would be anomalous if such a policy, effective to control such issues, were less effective when the question is simply whether the stevedore is entitled to the traditional securities afforded by the law of the sea to men who do the ship's work. Nor does it follow from the fact that the stevedore gains protections against his employer appropriate to the employment relation as such, that he loses or never acquires against the shipowner the protections, not peculiar to that relation, which the law imposes as incidental to the performance of that service. Among these is the obligation of seaworthiness. It is peculiarly and exclusively the obligation of the owner. It is one he cannot delegate. By the same token it is one he cannot contract away as to any

workman within the scope of its policy. As we have said, he is at liberty to conduct his business by securing the advantages of specialization in labor and skill brought about by modern divisions of labor. He is not at liberty by doing this to discard his traditional responsibilities. That the law permits him to substitute others for responsibilities peculiar to the employment relation does not mean that he can thus escape the duty it imposes of more general scope. To allow this would be, in substantial effect, to convert the ancient liability for maritime tort into a purely contractual responsibility. This we are not free to do.

"It remains to consider one other argument, namely, that the Haverty decision has been overruled, in effect, by the enactment of the Longshoremen and Harbor Workers' Compensation Act of March 4, 1927, 44 Stat. 1424, 33 U.S.C. § 901 et seq., 33 U.S.C.A. § 901 et seq., and therefore the effect of that decision as furnishing any support for including longshoremen within the owner's obligation of seaworthiness had been nullified. The argument is that by giving longshoremen the rights of compensation afforded by that Act against the employer and making them exclusive, Congress has withdrawn from them not only the protections gained by virtue of the Merchant Marine Act of 1920 under the Haverty decision, but also all other protections relating to personal injury which otherwise might be available to them under the general maritime law. In other words, it is claimed that the remedies afforded by the Longshoremen's legislation are exclusive of all other remedies for injuries incurred aboard ship, whether against the employer or others.

"This view cannot be accepted. Apart from the fact that the Uravic decision was rendered by a unanimous Court some three years after the Longshoremen's and Harbor Workers' Act was adopted, with a like result in Jamison v. Encarnacion, 281 U.S. 635, 50 S.Ct. 440, 74 L.Ed. 1082, the compelling answer is that Congress by that Act not only did not purport to make the stevedore's remedy for compensation against his employer exclusive of remedies against others. It expressly reserved to the stevedore a right of election to proceed against third persons responsible for his injury and in case of his election to receive compensation, it provided for assignment of his rights against third persons to his employer, binding the latter to remit to him any excess of the recovery over the compensation, expenses of recovery, etc."

There remains to be considered the character and extent of libellant's injury, and the amount of damages to which he is entitled as a result of these injuries.

As respects the nature of the injuries, there is no real variance in the testimony. One orthopedic surgeon testified on behalf of libellant and another on behalf of respondent, as well as a general physician. They all testified that libellant's injury was confined to the lumbo-sacral region of his back, and described it as a contusion and sprain of the back. There was no fracture of any kind. He was unable to do any work for about five months and has never returned to work as a stevedore but instead, has done work of different types of a lighter character. His orthopedic surgeon testified that as a result of the injury, he considered libellant had approximately 20% permanent disability in his back, and that he could never engage as heretofore in hard physical work. Respondent's surgeon agreed that libellant had a disability which might be permanent but considered it was not now, or likely ever to become more than a 10% disability. In fact he testified that in his opinion libellant could again undertake heavy labor such as he had previously done as a stevedore, provided he worked into it gradually. Both surgeons also found some minor congenital sprine abnormality but this condition they could not say was aggravated by libellant's fall which is the subject of the present suit.

The testimony discloses that prior to his injury libellant had been making as a stevedore, for several years, approximately $35 a week but that since his injury, his wages have not averaged more than approximately $20 a week.

There is no reason to question the credibility of the surgeons or physician who testified, they being persons of high stand-

974

ing in their profession. It is interesting to note what is indeed somewhat unusual in personal injury cases, that here there is no marked variance in the medical testimony.

We come then finally to the question as to the amount of damages to which libellant is entitled. At the time of the trial, he was 23 years old. Had he elected to receive compensation pursuant to the provisions of the Longshoremen's and Harbor Workers' Compensation Act, he would have been entitled to receive for this injury two-thirds of the difference between his average weekly wage at the time of the accident and the average weekly wage that he received thereafter, the same being payable during the continuance of his partial disability, but subject to reconsideration of the degree of physical impairment by the deputy commissioner on the latter's own motion or upon application of any party in interest. Section 8 (a) (21), 33 U.S.C.A. § 908 (a) (21). The statute places a maximum limit of $7,500 for any compensation payable under it for death of any type of injury. Section 14 (m), 33 U.S.C.A. § 914 (m).

■ We fully recognize that the amount of permissible and probable compensation to an employee who sees fit to accept compensation under the statute, is not necessarily to be taken as a criterion in estimating the amount of recovery in the present type of suit. We are to be guided rather by the general principles of damages properly recoverable for personal injury at common law and in admiralty. The latter, generally speaking, are more liberal towards the injured party than are compensation laws. However, had libellant elected to receive compensation under the Act, instead of suing the respondent, the total amount of such compensation would not now have been definitely ascertainable, because, while the basis for any award of compensation would at the present time be $10 per week, computed according to the requirement of the Act as just explained, how long the deputy commissioner would require such payment to be made would depend upon whether libellant's physical impairment changes, thereby affecting his wage-earning capacity.

■ Taking all factors into consideration, including the pain caused libellant by the injury; the period during which he was deprived of all earning power; the reduction in his earning power which may remain permanent, at least to some extent, and his age, we conclude that the claim which his counsel has made that libellant is entitled to $15,000 is out of all proportion to the nature of libellant's injury, and that a proper award to him is $2,500. From this amount, however, must be deducted and paid by way of reimbursement to his employer, The Cottman Company, the amount which the latter, pursuant to the Longshoremen's and Harbor Workers' Compensation Act, was required to pay to or on behalf of libellant as statutory compensation, and for medical treatment, prior to libellant's election to seek recovery from the present respondent. See The Etna, 3 Cir., 138 F. 2d 37.